Filing # 179571622 E-Filed 08/14/2023 01:20:17 PM

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
IN AND FOR COLLIER COUNTY, FLORIDA

ALTER BUSINESS ADVISORS, LLC,

    Plaintiff,

v.

    Case No.: _____

NICK GARULAY, THE DOC APP, INC.
d/b/a My Florida Green, and PITCREW
GG HOLDINGS, LLC,

    Defendants.
_____/

## COMPLAINT

**(Breach of Contract)**

Plaintiff, ALTER BUSINESS ADVISORS, LLC, sues Defendants, NICK GARULAY, THE DOC APP, INC. d/b/a My Florida Green, and PITCREW GG HOLDINGS, LLC a/k/a Pitcrew GGC Holdings, LLC, and alleges:

1. This is an action for breach of a written contract, seeking damages exceeding $50,000, exclusive of interest, costs, and attorneys' fees.

2. Plaintiff, Alter Business Advisors, LLC, is a Florida limited liability company with its principal address in Collier County, Florida.

3. Defendant, Nick Garulay ("Garulay") is an individual who resides in Collier County, Florida.

4. Defendant, The Doc App, Inc. d/b/a My Florida Green ("The Doc App"), is a Florida corporation with its principal address in Collier County, Florida.

5. Defendant, Pitcrew GG Holdings, LLC a/k/a Pitcrew GGC Holdings, LLC ("Pitcrew"), is a Florida limited liability company with its principal address in Collier County, Florida.

6.      Venue is proper, and this Court has personal jurisdiction over the Defendants, because the parties all reside in Collier County, Florida, and because Plaintiff's cause of action accrued here.

7.      All conditions precedent to this action have been satisfied or waived.

8.      Plaintiff is a Florida business brokerage firm with many years of experience and numerous accolades in the industry.

9.      The Doc App is a medical marijuana business.

10.     On or about October 13, 2022, Defendants executed the "Sole and Exclusive Right to Sell" listing Agreement (the "Contract") that is attached hereto as **Exhibit "A"**.

11.     The Contract was executed by Defendant Garulay, personally and as the Managing Member of Defendant, Pitcrew, which parties are called "Seller" under the Contract, on behalf of The Doc App, which was the company to be sold.

12.     Garulay is the principal of the corporate defendants, and at all material times described herein he acted with full authority on their behalf.

13.     The Contract specifies that it is an "exclusive right to sell" the company and "shall…continue for a period of twelve (12) months."

14.     The Contract specified an "asking price" of $6.5 million for The Doc App, with a commission (the "Commission") to Plaintiff of "10% of the purchase price or $50,000, whichever is greater," except in the event of certain specified breaches by the selling parties (i.e. Defendants), in which case 10% of the asking price ($650,000) would immediately be due.

15.     Pursuant to the terms of the Contract, all three Defendants are liable to Plaintiff for the Commission described herein. Indeed, paragraph 11 of the Contract specifies that Plaintiff has a security interest in The Doc App's assets to secure the payment of the Commission.

16.     On or about October 15, 2022, Plaintiff's listing of The Doc App went live.

17. At that time, Garulay expressed his doubts that any full-price ($6.5 million) offers would be received, but he allowed Plaintiff to pursue that asking price nonetheless and committed (including in the Contract) to sell The Doc App for that price.

18. Plaintiff aggressively marketed The Doc App, and, after countless hours of work, Plaintiff successfully generated 266 inquiries, interacted with numerous potential buyers, and obtained multiple full-price proposals.

19. As those full-price offers started to come in, Defendants (i.e. Mr. Garulay on their behalf) decided to cancel the sale, grow the business, and revisit the potential for selling the business later. Such cancellation is contemplated in the Contract, but it clearly says the full $650,000 Commission, based upon the full asking price, is then due to Plaintiff.

20. Specifically, paragraph 11 says "there will be a closing," and paragraph 4 provides:

> Seller agrees that if this listing is cancelled or the property withdrawn from sale during the listing term by Seller, the commission based upon the listing price shall become immediately due by Seller to Broker. If Seller refuses or is unable to comply with the listing terms for any reason, thereby preventing disposition of the property during the listing term upon the terms set forth above, the commission shall become immediately due by the Seller to the Broker.

21. Despite those clear terms, on December 12, 2022, which is two months after the Contract was signed, Defendants (by email from Garulay) instructed Plaintiff to cancel the listing:

> Let's remove the listing for now. I'm going to regroup. I have my east coast guy coming onboard who will be onboarding doctors. We are going to take this thing statewide and this way it would be more attractive for a buyer. I'll quadruple my numbers in the next 6 months.

22. The email quoted above was sent *the very next business day* after Plaintiff obtained a favorable response from a buyer to proposed terms that Defendants had authorized.

23. In response to the delisting instruction, Plaintiff advised Garulay (i.e. Defendants) that the listing would indeed be cancelled, but that Defendants would then owe the full $650,000 Commission. Upon hearing this, Garulay verbally backtracked from his demand to pull the listing,

but he commenced a pattern of behavior calculated to thwart any potential sale and frustrate Plaintiff to the point that Plaintiff would simply walk away from the deal (but Plaintiff did not).

24. For example, as Plaintiff continued to procure potential buyers who offered terms consistent with what Defendants had authorized, Garulay would invent bizarre reasons why the buyers were unacceptable. He insisted on doing personal background checks on everyone involved, and he accused buyers of being impostors with stolen identities (sometimes of deceased people from different parts of the country who happened to have the same or similar names) or of being undercover "feds," and he even referred to one buyer as "a suicide bomber." Garulay also openly discussed with buyers his irrational-sounding plans to "sue Governor DeSantis," which would obviously spook investors in such a regulated industry.

25. Additionally, Defendants kept changing the structure of the deal, such as requesting to retain equity or have a buy-back privilege, contrary to the terms set forth in the Contract.

26. Despite this belligerent and bizarre conduct from Garulay, Plaintiff persisted with diligent efforts to sell the business.

27. Frustrated with Plaintiff's persistence and desire to earn the Commission, on April 4, 2023, Garulay once again wrote to Plaintiff, copying The Doc App's new in-house legal counsel, Jason Castro, Esq., with a demand to cancel the listing: "You are NO LONGER advertising my business and/or marketing it to any potential buyers."

28. At the time that communication was sent, Plaintiff had generated 218 buyer inquiries. Garulay kept insisting they had poor moral character, were actually dead, were "stupid," or were "a fed" trying to infiltrate his marijuana business. He insisted on personally, aggressively, and belligerently vetting every potential buyer and its principal(s) in a manner calculated to spook the investors and kill the potential deals.

29. Nevertheless, Plaintiff persisted in its efforts to complete the sale of The Doc App and earn the Commission. And despite this bad conduct from Garulay, Plaintiff secured a buyer with which Defendants signed a letter of intent dated May 30, 2023, with authorized terms.

30. However, as before, Garulay changed his mind and took steps to thwart the sale, including refusing to cooperate with the due diligence process, in breach of paragraphs 4 and 11 of the Contract, and he ultimately cancelled the pending deal.

31. Before such cancellation of the deal, Garulay started making unreasonable demands for information from Plaintiff, and on July 24, 2023, Garulay made the "request that your company [i.e. Plaintiff] will voluntarily resign as the brokerage firm for this transaction."

32. When Plaintiff did not resign and walk away from the Commission, Defendants' attorney began peppering Plaintiff with unreasonable time-demands for written responses to numerous inquiries about Plaintiff's business, as if the parties were not already under contract.

33. When Plaintiff responded by offering its principal for in-person meetings but continued working diligently on the deal, Defendants once again served written notice of termination, this time on August 3, 2023.

34. Defendants followed such termination of the Contract and the listing with another attorney letter on August 7, 2023, threatening Plaintiff not to further communicate with Garulay. Importantly, they <u>copied the buyer</u> on that communication in a further effort to kill the pending deal. Defendants subsequently cancelled the potential sale to that buyer.

35. By virtue of the conduct described above, Defendants have breached the Contract and they owe Plaintiff the $650,000 Commission.

36. Plaintiff has been damaged by Defendants' breach of the Contract, and so Plaintiff is entitled to an award of money damages against Defendants.

37. Plaintiff fully performed its end of the bargain, except to the extent that Plaintiff was prevented from doing so by Defendants' breach and repudiation of the parties' Contract.

38.     Plaintiff has retained Boatman Ricci, P.A. as legal counsel and agreed to pay reasonable attorneys' fees for legal services.  Defendants are liable for such attorneys' fees under the terms of the Contract.

WHEREFORE, Plaintiff respectfully requests that a judgment be entered against Defendants for damages (i.e. the $650,000 Commission), plus prejudgment interest, attorneys' fees, costs, and any other relief deemed by the Court to be just and proper.


Dated:  August 14, 2023                              **BOATMAN RICCI**

　　　　　　　　　　　　　　　　　　　　　　　　 /s/ Jonathan R. Huffman
　　　　　　　　　　　　　　　　　　　　　　　　**Jonathan R. Huffman, Esq.**
　　　　　　　　　　　　　　　　　　　　　　　　Fla. Bar No. 56047
　　　　　　　　　　　　　　　　　　　　　　　　3021 Airport-Pulling Rd N., Ste. 202
　　　　　　　　　　　　　　　　　　　　　　　　Naples, Florida 34105
　　　　　　　　　　　　　　　　　　　　　　　　Primary Email: CourtFilings@boatmanricci.com
　　　　　　　　　　　　　　　　　　　　　　　　Secondary Email: JRH@boatmanricci.com
　　　　　　　　　　　　　　　　　　　　　　　　(239) 330-1494 – Telephone

　　　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*

# Exhibit "A"

# Marketing ⓢ SUNBELT. Agreement

**Company Name:** The Doc App Inc
**DBA:** My Florida Green
**Address:** 3400 Radio Rd Suite 109, Naples, FL 34104
**Phone:** 239-269-7713
**Business Type:** Corporation
**Entity Type:** Sub S
**Year Established:** 2017
**Years owned by Seller:** 5
**Principal Name(s):** Nicholas Garulay
**Email:** nick@myfloridaagreen.com
9

**Annual cash flow:** $720,531 (Approximate – 2021)
**Asking price:** $6,500,000      **Down Payment:** 10-25%
**Additional terms:**

**Reason for Sale to be disclosed to Buyers:** pursue other opportunities

**Bottom Line Price NOT to be disclosed to Buyers:** TBD

**Source:** Company Tax Returns

## SOLE AND EXCLUSIVE RIGHT TO SELL

1. **Asset Purchase Terms:** The Seller hereby grants Alter Business Advisors, LLC d/b/a SUNBELT BUSINESS BROKERS OF NAPLES, SARASOTA & FORT MYERS (hereinafter "Broker") the exclusive right to sell, lease, exchange, or contract to sell the real property and/or the assets of the above described business ("the business"), including all fixtures, equipment, goodwill, trademarks, trade names and inventory associated therewith. Seller and Broker acknowledge that this Agreement does not guarantee a sale, and Seller understands that Broker is engaged in a non-representation brokerage relationship. This Agreement shall commence on the day and year set forth below and continue for a period of twelve (12) months.

2. **Broker's Compensation:** The purchase price for the business shall include all cash or non-cash consideration, received by the Seller including, but not limited to, cash equivalents, notes, liabilities assumed, earnouts, licensing fees, lease agreements, non-compete and consulting agreements. Seller agrees to pay Broker at closing a fee as follows: 10% of the purchase price or $50,000, whichever is greater. Seller authorizes Broker to advertise and market the business. Seller will pay Broker a fee of $0 to extensively promote the business beyond Broker's normal scope. This fee will be deducted from Broker's commission.

3. **Timing of Broker's Commission Payment:** Notwithstanding any breach of this contract on the part of the Seller as outlined in sections 4,5,and 6, the Broker's commission *WILL BE PAID AT THE CLOSING AT THE SAME TIME THAT THE SELLER RECEIVES HIS/HER PROCEEDS.*

4. **Covenant to fully cooperate with the Broker for the duration of this agreement:** Seller agrees that if this listing is cancelled or the property withdrawn from sale during the listing term by Seller, the commission based upon the listing price shall become immediately due by Seller to Broker. If Seller refuses or is unable to comply with the listing terms for any reason, thereby preventing disposition of the property during the listing term upon the terms set forth above, the commission shall become immediately due by the Seller to the Broker.

5. **Covenant not to compete with the Broker:** Seller agrees that the commission shall be immediately due and payable if the Seller, directly or indirectly, enters into a Purchase and Sale Agreement (however designated), signs a Letter of Intent or Offer to Purchase Assets Document, conveys, options, transfers any interest in the business or, accepts a deposit or does any other act tantamount to a sale or contract to sell, without the written approval of the Broker, and the cancellation or rescission of any of the foregoing acts shall not act as a release of Seller from such liability.

6. **Possibility of a Stock (equity) Sale:** Although the assets of the business are listed for sale, occasionally the buyer and seller may agree to execute a stock transaction instead. For example, if the business has existing govt. contracts in place and the attorney determines that the a stock sale would be preferable, then the closing will take place and the broker's commission will be paid at the closing as defined in section 3. However, if the Seller's corporate stock is used to affect the sale or transfer of the Business to a family member or clandestine Buyer, in violation of this contract, the full commission as defined in paragraph 1 above shall be immediately payable based upon the Total Sales Price listed above.

7. **Buyer's earnest money deposit:** In any case where the deposit and/or down payment have been forfeited, this amount shall be split 50% to Seller and 50% to Broker.

8. The Seller acknowledges that he/she has supplied the listing information above and Seller warrants such information to be true and correct.

9. **Protection on Buyer's with Signed NDA's:** In the event that this agreement expires and is not renewed, Broker will provide a list of all Buyer's who have signed and NDA with the Broker and who have had negotiations with the Broker about the purchase of this specific business. *Only with respect to this very specific list of buyers,* the Seller agrees to pay the brokers full commission at the closing of any transaction that would occur within 24 months of the expiration date of this agreement if the buyer had signed an NDA with the broker during the term of this agreement. Seller agrees to pay the commission to broker no later than closing. *The Seller may sell the business to anyone else after the expiration of this agreement without paying any commission to the Broker.*

10. Seller hereby acknowledges that he/she has read this agreement and has received a copy of it.

11. **Covenant not to cancel a pending transaction:** Seller understands that there will be a closing. Seller shall furnish and execute all documents necessary to close on the sale of the business free of all liens and encumbrances. Seller may be required to pay certain closing costs and Seller wishes for Broker to arrange such closing. Seller agrees to pay Broker's commission, if not paid prior to, then at closing; and Seller grants to the Broker a security interest in and over the assets of the Business for the amount of the Broker's commission. Seller authorizes Broker to file this Agreement at any time as a Financing Statement under the FL UCC to perfect a lien on the Business to secure such payment calculated upon the Total Sales Price listed above. Seller will advise Broker of any scheduled Closing and have Broker present.

12. Seller acknowledges that he understands the benefits of obtaining a business evaluation independent of Broker. Seller agrees to indemnify and hold Broker harmless from claims against Broker regarding any opinion of business value given by Broker.

13. Within fourteen (14) days of the execution of this Agreement, Seller shall provide to Broker copies of ALL business-related documents including, but not limited to: Business' tax returns, income statements and balance sheets for the last 3 completed calendar years and the current calendar year to date; Lease and other real property documents; Equipment lease documents; Itemization of all liens and encumbrances; Itemization of inventory and equipment; Description of any and all current or pending litigation or material business issues. Such information will not be independently verified by Broker and will be presented to prospective buyers in the course of selling the Business. Seller agrees to hold harmless and indemnify the Broker for all claims, losses, damages, and expenses, including reasonable attorney fees resulting from a breach of Seller's representation.

14. Seller agrees to immediately refer to Broker all inquiries of any party interested in the Business. All negotiations are to be through Broker.

15. This Agreement is binding upon the heirs, successors, and assigns of the parties.

16. All of the representations and covenants of this Agreement shall survive and be enforceable after the termination of this Agreement.

17. This agreement represents the entire agreement between the parties hereto and may be modified only in writing executed by the parties.

# Marketing  Agreement

18. This Contract shall be governed by the laws of the state of Florida. Any breach of this Agreement shall result in the prevailing party being entitled to receive from the other party all of its reasonable attorney's fees, costs, and expenses incurred at both the trial and appellate levels. The parties hereby consent to personal jurisdiction and venue, for any action arising out of a breach or threatened breach of this Agreement in the Circuit Court in and for Collier County, Florida. The parties hereby agree that any controversy which may arise under this Agreement would involve complicated and difficult factual and legal issues. Therefore, any action brought by either party, alone or in combination with others, whether arising out of this Agreement or otherwise, shall be determined by a Judge sitting without a jury. Should any suit be commenced to enforce the Broker's rights herein, the prevailing party agrees the other party shall pay the expenses connected therewith, including attorney's fees incurred. The parties agree that any dispute arising from this agreement will be referred to binding arbitration in accordance with the rules of the American Arbitration Association.

19. Seller warrants it has the full legal right to sell the business and any associated real property. If Seller is a partnership, corporation or other entity, the person(s) signing on behalf of such entity hereby represent(s) and warrant(s) that he/she is, or they have the authority to enter into this contract on behalf of said entity. If Seller is a corporate entity, Seller agrees that all officers, directors, and/or members of the corporate entity, currently or in the future, personally guarantee performance of this Agreement.

20. If any provision of this Agreement is declared invalid or unenforceable, the remaining provisions shall be unaffected and will continue to be enforceable.

**ACCEPTED BY:**

Alter Business Advisors, LLC d/b/a SUNBELT BUSINESS BROKERS OF NAPLES, SARASOTA & FORT MYERS

Joe Alter
Listing Agent Name    Broker's Signature – Joseph Alter

Date: 10-13-2022

*********************************************************************

**SELLER(S)**

SELLER(S) Signing Personally

Nick
Seller Signature(s)    Printed Name

Date: 10-13-22

Printed Name(s)

Its: managing member    Date: 10-13-22

Pitcrew GGC Holdings

**SELLER(S) Signing Personally**

**SELLER(S) Signing Personally**

Nick Ganley
Seller Signature(s)    Printed Name

Date: 10-13-22